IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**BLACK & VEATCH CONSTRUCTION, INC**,    Civil Case No. 09-1163-KI

                Plaintiff,

     vs.    OPINION AND ORDER

**JH KELLY, LLC**,

                Defendant

_____

**JH KELLY, LLC**, a Washington Corporation,

                Defendant/Third-Party Plaintiff,

     vs.

**MITSUBISHI POWER SYSTEMS, INC.**, a
Delaware Corporation,

                Third-Party Defendant.

Page 1 - OPINION AND ORDER

Kerry J. Shepherd
Markowitz Herbold Glade & Mehlhaf, PC
3000 Pacwest Center
1211 SW Fifth Avenue
Portland, Oregon  97204-3730

Roy Bash
Catherine Bell
Polsinelli Shughart, P.C.
Twelve Wyandotte Plaza
120 West 12th Street, Suite 1600
Kansas City, MO  64105

      Attorneys for Plaintiff

Heather C. Beasley
Davis Rothwell Earle & Xochihua P.C.
111 SW Fifth Avenue, Suite 2700
Portland, Oregon  97204-3650

      Attorney for Defendant JH Kelly, LLC.

Harlan E. Jones
Jordan Schrader Ramis, PC
PO Box 230669
Portland, Oregon  97281

      Attorney for Third-Party Defendant Mitsubishi Power Systems, Inc.

KING, Judge:

      Plaintiff Black and Veatch Construction, Inc. ("BVCI" or "plaintiff") brings a complaint for breach of contract and express warranty, and seeks indemnification, against defendant JH Kelly.  JH Kelly, in turn, filed a third-party complaint against Mitsubishi seeking indemnity and contribution.  Pending before the Court are JH Kelly's Motion for Partial Summary Judgment [46] against some of the claims brought by BVCI and for judgment on its own affirmative defenses and Mitsubishi's Motion for Summary Judgment against JH Kelly [50].  For the

Page 2 - OPINION AND ORDER

following reasons, I deny JH Kelly's motion and grant Mitsubishi's motion. JH Kelly's third-party complaint against Mitsubishi is dismissed with prejudice.

## BACKGROUND[1]

This dispute is about which of three contracting entities must pay for damage to a combustion turbine at a Portland General Electric ("PGE") power generating facility called the Port Westward power plant. Plaintiff entered into a contract with PGE to engineer, procure, and construct the power plant. Plaintiff subcontracted specified aspects of the work to defendant JH Kelly, including installing the combustion turbine and associated air inlet filter house and air inlet filter duct. Third-party defendant Mitsubishi manufactured the combustion turbine and the air inlet filter house and air inlet filter duct components.

Mitsubishi sold the combustion turbine generator and associated equipment to PGE pursuant to a Power Island Equipment Purchase Agreement ("PIEPA"). PGE thereafter assigned certain duties in the PIEPA to plaintiff. Pursuant to the PIEPA, Mitsubishi delivered the turbine to the Port Westward site. Under Section 24 of the PIEPA, the risk of loss for the combustion turbine passed to plaintiff upon delivery. Thangyah Decl. Ex. 1, at 15.

Pursuant to its obligations under the subcontract, JH Kelly erected the turbine, air inlet filter house and air inlet filter duct. JH Kelly asserts in its response to Mitsubishi's motion for summary judgment that, as part of its sales transaction, Mitsubishi manufactured, delivered and oversaw the installation of the sophisticated turbine. It had agents on-site throughout the installation and start-up process and advised JH Kelly and plaintiff about installation and start-up requirements. According to JH Kelly, the Mitsubishi agents also inspected the work performed

---

[1]Unless otherwise noted, the facts come from the parties' joint proposed pretrial order.

by JH Kelly and plaintiff.  JH Kelly certified it had completed all work related to the combustion turbine, air inlet filter house and air inlet filter duct.  On January 11 and 12, 2007, Mitsubishi and JH Kelly employees entered portions of the air inlet filter house and air inlet filter duct to "check nuts that have been killed in filter house."  Pre-trial Order, Agreed Facts ¶ 8.  This means the employees "[e]ssentially secured [the nuts] so they wouldn't come off from vibration."  Beasley Decl. in Supp. of JH Kelly's Resp. to Mitsubishi's Mot. for Summ. J. (hereinafter, "Beasley Decl. I") Ex. C, Gettinger Dep. 168:22-24, Nov. 30, 2010.

The combustion turbine works by sucking air from the filter house and inlet filter duct into the compressor section of the turbine (comprised of many rows of alternating rotating and stationary blades) where it is compressed and then released into the combustion section of the turbine.  Thangyah Decl. ¶ 9.  During a scheduled outage of the combustion turbine, on April 12, 2007, damage to the compressor blades in the combustion turbine was discovered.  The turbine was disassembled to determine the cause of the damage.  Foreign object damage to a number of compressor blades was discovered inside the combustion turbine.  In May 2007, materials were found inside the air inlet filter house and air inlet filter duct, including a cutoff bolt with tack welded nut, a welding rod, and a half-moon-shaped cut metal plate, in addition to other foreign objects.

Plaintiff alleges JH Kelly failed to clean the inlet air housing and ductwork, in breach of its subcontract, which caused damage to the blades.  JH Kelly does not admit that the damage to the turbine resulted from foreign objects entering the machine from outside the compressor.  A

JH Kelly employee has testified that foreign object debris was found in the machine upon

Mitsubishi's delivery in April 2006.  Beasly Decl. I Ex. E, Lee Dep. 16:22-17:12, Oct. 20, 2010.[2]

It is undisputed that foreign objects caused the damage to the blades "the identification

and source of which could not be determined."  JH Kelly's Answer ¶14.  Plaintiff and Mitsubishi

negotiated a change order for the additional work needed to repair the foreign object damage.

Mitsubishi repaired the turbine and testing resumed on May 25, 2007.  Substantial completion, as

defined by the agreement between plaintiff and PGE, was obtained on June 9, 2007.

Plaintiff paid PGE for the damage to the combustion turbine.  Plaintiff now seeks from

JH Kelly $1.5 million in costs to repair the damage to the combustion turbine and $2.1 million

due to delays caused by the foreign object damage work.

The parties have previously undertaken to mediate this case and have been able to resolve

many issues, with the exception of the present claims.  As relevant to JH Kelly's ninth

affirmative defense regarding the jury trial waiver, and as part of settlement efforts, plaintiff and

JH Kelly entered into a Settlement Agreement and Release dated August 9, 2007 which stated in

part:  "For purposes of this paragraph, the determination of JHK's FOD [foreign object damage]

liability shall be by:  (a) mutual agreement of JHK and BVCI; or (b) the dispute resolution

clauses of the Contracts."  Pl.'s Resp. to JH Kelly's Concise Statement of Material Facts

(hereinafter, "Pl.'s CSMF") Ex. 3, at 2.

_____

[2]JH Kelly also argues, "After damage to the turbine blades was discovered in April 2007, debris similar to that found in the turbine itself in April 2006 was found in the turbine."  JH Kelly's Resp. to Mitsubishi's Mot. for Summ. J. 7.  JH Kelly provides no citation to any evidence in support of this statement.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the court "must view the evidence on summary judgment in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party." Nicholson v. Hyannis Air Service, Inc., 580 F.3d 1116, 1122 n.1 (9th Cir. 2009) (citation omitted).

## DISCUSSION

**I.    JH Kelly's Motion for Partial Summary Judgment**

Defendant JH Kelly seeks partial summary judgment on plaintiff's claim for indemnity, and on its own eighth affirmative defense (contractual limitation of damages) and its ninth affirmative defense (waiver of right to a jury trial).

**A.    Indemnification Claim**

Plaintiff demands that JH Kelly indemnify it for the cost of repairing the damage to the combustion turbine. It relies on the Indemnity provision in Section 00553.51 of the Subcontract between plaintiff and JH Kelly.

Section 00553.51 reads:

**00553.51        Indemnity**

00553.51.1  SUBCONTRACTOR AGREES TO DEFEND, INDEMNIFY, PROTECT, AND HOLD HARMLESS THE INDEMNIFIED PARTIES FROM AND AGAINST THAT PORTION OF ANY AND ALL DEMANDS, LIENS OR OTHER ENCUMBRANCES ON ANY INDEMNIFIED PARTY OR ITS PROPERTY, CLAIMS, SUITS AND CAUSES OF ACTION AND ANY AND ALL LIABILITY, COSTS, EXPENSES, AND JUDGMENTS INCURRED IN DIRECT CONNECTION THEREWITH (INCLUDING, WITHOUT LIMITATION, COURT COSTS AND REASONABLE ATTORNEY'S FEES, INCLUDING THOSE ON APPEAL), BROUGHT BY ANY OF SUBCONTRACTOR'S EMPLOYEES, AGENTS, SUB-SUBCONTRACTORS, OR REPRESENTATIVES, OR BY ANY GOVERNMENTAL AUTHORITY OR BY ANY OTHER THIRD PARTY (FOR PURPOSES OF THIS SECTION, THE "**CLAIMANT**"), FOR BODILY INJURY (INCLUDING DEATH) AND/OR PHYSICAL DAMAGE TO THIRD PARTY PROPERTY, BUT ONLY IF AND TO THE EXTENT CAUSED BY SUBCONTRACTOR'S OR ITS SUB-SUBCONTRACTOR'S NEGLIGENCE, WILLFUL MISCONDUCT, OR STRICT LIABILITY IMPOSED AS A MATTER OF LAW AND EVEN IF DUE IN PART TO THE INDEMNIFIED PARTY'S CONCURRENT NEGLIGENCE, WILLFUL MISCONDUCT, OR STRICT LIABILITY WITHOUT REGARD TO FAULT; PROVIDED, HOWEVER, THAT SUBCONTRACTOR'S CONTRACTUAL OBLIGATION OF INDEMNIFICATION SHALL NOT EXTEND TO THE PERCENTAGE OF THE CLAIMANT'S DAMAGES OR INJURIES OR ANY OTHER DAMAGES TO THE EXTENT CAUSED BY THE INDEMNIFIED PARTY'S, OR ANY OTHER PARTY'S (OTHER THAN SUBCONTRACTOR OR ITS SUB-SUBCONTRACTOR'S) NEGLIGENCE, WILLFUL MISCONDUCT, OR STRICT LIABILITY . . . .

00553.51.2  TO THE FULLEST EXTENT OF THE LAW, SUBCONTRACTOR RELEASES THE INDEMNIFIED PARTIES AND SUBCONTRACTOR SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS THE INDEMNIFIED PARTIES AND THE OWNER(S) OF THE REAL PROPERTY COMPRISING THE JOBSITE . . . FROM AND AGAINST ANY AND ALL DAMAGES [relating to hazardous material].

Beasly Decl. in Supp. of JH Kelly's Mot. for Partial Summ. J. (hereinafter, "Beasley Decl. II")

Ex. 1, at 6.

JH Kelly seeks to avoid payment of the portion of the settlement plaintiff paid to PGE in

the amount of $2.1 million for the delay attributable to repairing the damage to the turbine.  It

Page 7 - OPINION AND ORDER

does not dispute that plaintiff may seek reimbursement for the cost to  repair the damage to the

"third party property" (the turbine), although it denies liability for those damages, but it does

dispute that plaintiff may recover what it calls consequential damages.  It seeks judgment on

plaintiff's Second Claim for Relief for indemnification to the extent plaintiff seeks recovery of

$2.1 million in  "consequential" damages.

JH Kelly parses the language of the subcontract and argues the indemnity provision

creates an indemnity obligation for only "physical damage to third party property."  Id., Sec.

00553.51.1.[3]  It argues an agreement to indemnify for "physical damage to third party property"

is not an agreement to indemnify for economic delay damages.  Angelo Iafrate Constr., LLC v.

Potashnick Constr., Inc., 370 F.3d 715, 721 (8th Cir. 2004) (duty to indemnify claims "brought

because of any injuries or damage received or sustained by any person, persons, or property on

account of the operations of the said Contractor.").

I disagree with JH Kelly that delay damages are not recoverable under the language of the

indemnity provision.  The language imposes a duty on JH Kelly to indemnify plaintiff "FROM

AND AGAINST . . . CLAIMS, SUITS AND CAUSES OF ACTION AND  ANY AND ALL

LIABILITY, COSTS, EXPENSES, AND JUDGMENTS INCURRED IN DIRECT

---

[3]JH Kelly agrees that PGE is a "third party" for purposes of this provision, even though PGE is otherwise referred to in the subcontract as "Owner."  See, e.g., Pl.'s CSMF Ex. 1 (Sec. 00553.13.1:  "Purchaser and Owner may reproduce any submittals received . . ."; Sec. 00553.14.3.1:  "Goods shall be subject to expediting and inspection prior to shipment by Purchaser, Owner, and their representatives, and by third parties . . ."; Sec. 00553.14.3.2:  "Subcontractor shall provide Purchaser, Owner, their representatives, and third parties . . . reasonable access to its facilities . . . ."; Sec. 00553.14.4.1:  "Purchaser, Owner, their representatives, or third parties as may be required by Applicable Laws, shall have the right at all reasonable times to inspect the Work at the Jobsite for conformance with this Subcontract"; Sec. 00553.18.3:  "Subcontractor, if and to the extent requested to do so by Purchaser, shall promptly assign to Purchaser, or Owner, . . . Subcontractor's rights, title and interest to the Goods . . .").

CONNECTION THEREWITH . . . BROUGHT BY . . . ANY OTHER THIRD PARTY . . ., FOR

. . . PHYSICAL DAMAGE TO THIRD PARTY PROPERTY[.]"  Beasly Decl. II Ex. 1, at 6.  An

obligation to indemnify for "any and all liability [and] costs" is broader than just an obligation to

repair the damage to third party property.  In other words, JH Kelly's negligence in causing

"physical damage to third party property" is the trigger for application of the indemnification

provision, at which point JH Kelly, as the indemnitor, becomes responsible for "any and all

liability" with which the indemnitee had previously been charged.

JH Kelly alternatively relies on the specific exclusion of its liability for consequential

damages.  The relevant language is plain and unambiguous, reading:

**00553.53  Consequential Damages**

*00553.53.1 Except as provided below, in no event shall either Party to this
Subcontract be liable to the other Party, whether in contract, tort (including
negligence), . . . or any other legal theory, for cost of capital, loss of profits or
revenue, loss of anticipated profits or revenue, loss of use or increased expense of
use of equipment or plant, loss of power or production, cost of purchased or
replacement power or production, or claims of customers for loss of power or
production, or for any special, indirect, incidental, consequential, exemplary, or
punitive loss or damages.*

*00553.53.2 EXCEPT AS PROVIDED BELOW, IN NO EVENT SHALL PORTLAND
GENERAL ELECTRIC COMPANY (**"PGE"**) OR J.H. KELLY
(**"SUBCONTRACTOR"**) BE LIABLE TO THE OTHER . . . FOR ANY SPECIAL,
INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, OR PUNITIVE LOSS
OF [SIC] DAMAGES. THE FOREGOING PROVISION SHALL NOT BE
APPLICABLE TO AND SHALL IN NO WAY LIMIT THE LIABILITY OF
SUBCONTRACTOR IN CASES OF FRAUD OR WILLFUL MISCONDUCT . . . .*

Id., at 8 (hereinafter, "Consequential Damages Clauses").

Plaintiff argues the consequential damages provision applies only to damage claims

between PGE and JH Kelly, and does not relate to plaintiff at all.  Plaintiff also suggests that the

damages paid by it to PGE may be considered consequential damages *to PGE*, but as between it

Page 9 - OPINION AND ORDER

and JH Kelly they are actual damages–damages that resulted directly from the failure of JH Kelly
to perform its contractual obligations.

I read the Consequential Damages Clauses to preclude plaintiff from recovering delay
damages from JH Kelly.  The first clause characterizes the array of possible damages from PGE's
perspective.  It  anticipates that plaintiff might be on the hook for costs associated with "loss of
power or production, cost of purchased or replacement power or production, or claims of
customers for loss of power or production;" these are the kind of damages only PGE could suffer
and not a contractor like plaintiff.  Consequently, the parties could not have intended for plaintiff
to re-characterize the delay damages it paid to PGE as actual damages.  Furthermore, in the
second clause, PGE waived the right to obtain consequential damages from JH Kelly, and it is
not a rational interpretation of this provision to read it as allowing plaintiff to seek from JH Kelly
the very damages PGE could not recover.

In the end, however, I must deny JH Kelly's motion for partial summary judgment.  Just
after the Consequential Damages Clauses appears a provision that reads as follows:
"Notwithstanding anything herein to the contrary, the waivers of Article 00553.53.1 and Article
00553.53.2 [the Consequential Damages Clauses] will not apply to:  (a) damages of any third
party for which Subcontractor has an indemnification obligation under this Subcontract . . . ."  Id.
at 8, Sec. 00553.53.3.  Since JH Kelly has an "indemnification obligation under this Subcontract"
for "claims, suits and causes of action and any and all liability, costs, expenses and judgments
incurred in direct connection therewith" brought by PGE against plaintiff due to JH Kelly's

negligence, the Consequential Damages Clauses do not apply.[4]  JH Kelly gives no other

interpretation of this clause.

JH Kelly's motion is denied as to this claim.

B.    Jury Trial

JH Kelly seeks judgment on its ninth affirmative defense in which it alleges that the

parties waived any right to a jury trial in Section 00553.54.1 of the contract between plaintiff and

JH Kelly.

The disagreement about whether plaintiff is entitled to a jury trial or not arises largely

from language in an August 9, 2007 Settlement Agreement, in which reference is made to the

Disputes provisions of the subcontract.  The Settlement Agreement reads, in relevant part,

**6.    Withheld Retention**

BVCI is withholding $500,000 in retention ("Withheld Retention") pending the
determination of responsibility for the FOD issues described in Paragraph 3A
above.  Interest will accrue on the Withheld Retention pursuant to ORS 701.420.
If Kelly is determined to be liable for the FOD, then the Withheld Retention and
accrued interest will be retained by BVCI and credited toward Kelly's liability; if
Kelly's proportionate share of liability for the FOD does not exhaust the Withheld
Retention and accrued interest being held by BVCI, then any difference between
Kelly's liability and the remaining balance will be paid to Kelly.  If Kelly is
determined to not be liable for the FOD, then the Withheld Retention and interest
will be paid to Kelly.  For purposes of this paragraph, the determination of Kelly's
FOD liability shall be by:  (a) mutual agreement of Kelly and BVCI; or (b) the
dispute resolution clauses of the Contracts.

Pl.'s CSMF Ex. 3, at 2 (emphasis added).  Paragraph 3.A. refers to the "Alleged Foreign Object

Damage to the M501G combustion turbine discovered on or about April 13, 2007 ('FOD') that is

---

[4]This provision is further support for interpreting the indemnification provision to
obligate JH Kelly for damages beyond just the "physical damage to third party property."  The
parties anticipated that JH Kelly may have an indemnification obligation for consequential
damages, otherwise this language would be unnecessary.

still being investigated, including any claim under an insurance policy, for indemnity or for liquidated or actual damages with respect thereto." Id. at 1.

Plaintiff first argues that the language in the Settlement Agreement on which JH Kelly relies refers to the limited issue of a $500,000 retention, not the full FOD claim. The flaw in this argument is that the two issues are intertwined; in order to evaluate what happens with the withheld retention, a determination must be made as to JH Kelly's responsibility for the foreign object damage. Paragraph six of the Settlement Agreement directs that "determination of Kelly's FOD liability shall be by" either agreement between the parties, or by "the dispute resolution clauses of the Contracts." Indeed, under plaintiff's construction of the paragraph, it is unclear what would remain for resolution by "the dispute resolution clauses" if the language is not read to mean JH Kelly's foreign object damage liability.

Plaintiff asserts that the Settlement Agreement specifically excludes the foreign object damage issue from the release. In the Agreement, the parties agreed to the following:

> 3.   **Exclusions from Release**
>
> Kelly and BVCI agree that obligations, claims, rights, damages or entitlements in any way associated with the following issues shall not be released, discharged, impaired or otherwise affected by the terms of this Agreement:
>
> A.    Alleged Foreign Object Damage to the M501G combustion turbine discovered on or about April 13, 2007 ("FOD") that is still being investigated, including any claim under an insurance policy, for indemnity or for liquidated or actual damages with respect thereto.

Pl.'s CSMF Ex. 3, at 1. I note, however, that the parties also "excluded" the following:

> D.    $500,000 in retention money plus interest being held by BVCI pending a determination of responsibility for the FOD, as further described in paragraph 6.

Id.  Consequently, it appears the parties did, in fact, intend to "affect[]" the foreign object

damage issue by the terms of the Settlement Agreement.[5]

In short, the "dispute resolution clauses of the Contracts" is the language I must construe.

Specifically, the question is which of the two provisions applies:  the first dispute resolution

provision, containing a jury trial waiver, or the second, which does not.

The first dispute resolution clause comes from the prime agreement between PGE and

plaintiff.  It requires that "[a]ny claim, dispute or controversy arising out of or relating to [the

Prime Agreement] or the breach, validity or termination of [the Prime Agreement]" will be

handled first by project management personnel and then elevated to senior management.  Beasley

Decl. II Ex. 1, at 8.  If unsuccessful, the parties choose a mediator.  If, after mediation, the

dispute is not resolved, "each Party shall have the right to take whatever legal actions a Party may

choose."  Id.  However, "EACH PARTY WAIVES ANY RIGHT IT MAY HAVE TO A JURY

TRIAL IN CONNECTION WITH ANY ACTION, SUIT OR PROCEEDING ARISING OUT

OF OR RELATED IN ANY WAY TO THIS AGREEMENT."  Id. at 9.  A subsequent clause

permits JH Kelly to participate in the dispute resolution process, permits it to appeal, or request

plaintiff to appeal, and requires it to bear its own costs.

The second dispute resolution clause reads as follows:

> 00553.54.3  Other claims between Subcontractor and Purchaser of any kind
> whatsoever and not addressed in Articles 00553.54.1 and 0053.54.2 above,
> including disputes regarded as such by only one of the Parties, shall be resolved
> by any federal court with jurisdiction over the Jobsite or any state court located in
> Oregon.  To the extent Purchaser or Subcontractor prevails against the other Party

---

[5]Plaintiff "took the lead in drafting the Settlement Agreement" and any ambiguities
should be construed against it.  Beasley Decl. II Ex. 2, at 1; see Hoffman Construction Co. v.
Fred S. James & Co., 313 Or. 464, 470-71, 836 P.2d 703 (1992).

on such claim, reasonable dispute resolution costs including attorney fees shall be recoverable from the losing Party.

Id. at 9 (emphasis in original).

JH Kelly suggests that the parties must have agreed to use the first dispute resolution provision because they used the plural term "Contracts" in the Settlement Agreement, which means the dispute resolution procedure contained in both the Prime Contract and the subcontract. "Contracts," however, is a defined term in the Settlement Agreement and refers to the two subcontracts JH Kelly entered with plaintiff.  Each of the subcontracts contains identical dispute resolution clauses, which are summarized above.

Alternatively, according to JH Kelly, the parties' use of the term "dispute resolution clauses of the Contracts" is ambiguous.  One could accept its interpretation (that the first dispute resolution provision was intended) or one could accept an interpretation that the parties intended to use the second dispute resolution provision, which permits a lawsuit in either state or federal court.  JH Kelly suggests the latter interpretation would be redundant of the parties' remedies at the time; why would either party stipulate to "the dispute resolution clauses of the Contracts"–meaning the ability to file suit in state or federal court–when they had that remedy to begin with?  Furthermore, the first dispute resolution clause is specifically labeled, "Dispute Resolution" whereas the second clause is not similarly labeled.

I agree with JH Kelly that the reference to "dispute resolution clauses of the Contracts" in the Settlement Agreement is ambiguous.  For a contract or term to be ambiguous, "it must be susceptible to at least two plausible interpretations when examined in the context of the contract as a whole."  Moon v. Moon, 140 Or. App. 402, 407, 914 P.2d 1133 (1996) (quotation and

citation omitted).  At face value, the Settlement Agreement seems to incorporate the entire

Disputes section of the subcontracts.  However, it makes little sense to reference both clauses if

any remaining issues no longer involved PGE and the prime agreement, unless the parties

anticipated adopting that four-part resolution process for purposes of the foreign object damage

issue.  Further, it is a rational interpretation of the Settlement Agreement that the parties intended

something more than a lawsuit.  Finally, the first dispute resolution clause is specifically labeled

"Dispute Resolution" and the parties' use of that language in the Settlement Agreement implies

the parties intended to utilize the four-part resolution method called for by the prime agreement

in order to resolve the foreign object damage issue.

      However, I cannot grant summary judgment to JH Kelly at this time as material issues of

fact remain.  The analytical framework applicable to contract interpretation under Oregon law

allows the court to "examine extrinsic evidence of the contracting parties' intent" if it finds the

contract to be ambiguous.  Yogman v. Parrott, 325 Or. 358, 361, 937 P.2d 1019 (1997).  If the

ambiguity is not resolved, the court uses "appropriate maxims of construction."  Id. at 364.  Here,

I have no evidence of the parties' intentions in drafting the Settlement Agreement,[6] or of the

parties' conduct after they executed the settlement agreement.[7]  See Goodman v. Continental

_____

      [6]The parties' intentions in drafting the settlement agreement might overlap somewhat
with the issue of what authority the attorneys had, as described below, if the attorneys drafted the
Settlement Agreement.

      [7]There is some indication the parties themselves completed the first two steps of the four-
step dispute resolution process–indicating they construed the Settlement Agreement to refer to
the first dispute resolution clause–but, without more concrete evidence of this, I am unwilling to
grant summary judgment to JH Kelly.  See Beasley Decl. II Ex. 2, at 2 ("We understand that the
first two steps have been carried out informally by the parties with no success"); Ex. 2, at 3
(suggesting a condition for proceeding with mediation was an acknowledgment from plaintiff
"that the parties have been unable to resolve the dispute through negotiation by their respective

Cas. Co., 141 Or. App. 379, 918 P.2d 438 (1996) (parties' performance is persuasive evidence of

meaning); Yogman, 325 Or. at 364 (the parties' "practical construction of an agreement may hint

at their intention") (citing Tarlow v. Arntson, 264 Or. 294, 300, 505 P.2d 338 (1973) ("How the

original parties and their successors conducted themselves in relation to the agreement is

instructive in our determination of what must have been intended.")).

JH Kelly instead relies on the attorneys' actions after execution of the Settlement

Agreement.  In letter communications between counsel, after adoption of the Settlement

Agreement, plaintiff's counsel made it clear that plaintiff consented to the "formal dispute

resolution procedures" and did not dispute that the last step of those procedures was a bench trial.

Beasley Decl. I Ex. 2, at 2.  However, plaintiff's counsel testifies by affidavit that he "did not

have authorization from BVCI to change or modify the terms of the settlement agreement or the

subcontract relating to the dispute resolution process."  Bash Decl. ¶ 4.  It is possible plaintiff

vested counsel with apparent authority to bind it, but JH Kelly has failed to submit evidence of

any of plaintiff's actions that JH Kelly reasonably interpreted to mean plaintiff gave its counsel

authority to bind it to the process set out in first dispute resolution clause.  Cf. Kaiser Found.

Health Plan of the Northwest v. Doe, 136 Or. App. 566, 573, 903 P.2d 375 (1995) ("Apparent

authority is created by conduct of the principal, which when reasonably interpreted causes a third

party to believe that the principal has authorized the agent to act on the principal's behalf in the

matter" and describing all offers as coming through counsel, making it reasonable for opposing

_____

senior management representatives and that the next step in the dispute resolution procedures is
mediation.").  JH Kelly's CSMF only states the undisputed fact that the parties submitted the
disagreement to mediation, but that need not necessarily have been pursuant to the process called
for by the first dispute resolution clause.

party to believe counsel had authority to settle), opinion modified on other grounds by, 138 Or.

App. 428, 908 P.2d 850 (1996).

Because material issues of fact remain, I deny JH Kelly's motion for partial summary

judgment on its ninth affirmative defense.

C.      Attorney Fees

JH Kelly also seeks judgment on its eighth affirmative defense in which it alleges

plaintiff's damages are limited by the terms of the subcontract.  Relying on the same argument

set forth with respect to the jury trial waiver clause, JH Kelly asserts that the dispute resolution

provision directs that each party "shall individually bear the costs associated with their own

claims in such appeal."  Beasley Decl. I Ex. 1, at 9, Sec. 00553.54.2.  The material issues of fact I

identified above with respect to the jury trial waiver also preclude JH Kelly's motion for partial

summary judgment on its eighth affirmative defense.

II.    Mitsubishi's Motion for Summary Judgment Against JH Kelly's Third-Party Complaint

Mitsubishi moves for summary judgment against JH Kelly's indemnity and contribution

claims as a matter of law, and alternatively it argues there is no evidence as to what caused the

damage to the turbine.

A.      Indemnity Claim

JH Kelly alleges a common law indemnity claim against Mitsubishi.  In a common law

indemnity action, a plaintiff must prove that: (1) it discharged a legal obligation owed to a third

party;[8] (2) defendant was also liable to the third party because of a duty common to that owed by

---

[8]JH Kelly's third-party claim for indemnity is permitted even though JH Kelly has not discharged any obligation.  Doing so fulfills the purpose behind Federal Rule of Civil Procedure 14 permitting third-party practice.  See Huff v. Shiomi, 73 Or. App. 605, 608, 699 P.2d 1178

plaintiff; and (3) as between plaintiff and defendant, the obligation ought to be discharged by

defendant. Moore Excavating, Inc. v. Consolidated Supply Co., 186 Or. App. 324, 328-29, 63

P.3d 592 (2003); Safeco Insurance Co. v. Russell, 170 Or. App. 636, 639-40, 13 P.3d 519 (2003).

Mitsubishi initially read the third-party complaint to allege indemnity on the basis of tort.

JH Kelly explained in its response brief that both JH Kelly and Mitsubishi owed a common duty

to plaintiff arising out of contract.  Mitsubishi agrees that common contractual duties to a third

party can support a claim.  Star Mountain Ranch v. Paramore, 98 Or. App. 606, 609, 780 P.2d

758, 759 (1989).  Accordingly, the question I face is whether Mitsubishi could be liable to

plaintiff because of a duty common to that owed by JH Kelly to plaintiff.

Based on the subcontract between plaintiff and JH Kelly, JH Kelly had a nonspecific

contractual obligation to clean the inlet filter house; it argues that the PIEPA between Mitsubishi

and PGE called for Mitsubishi also to inspect the inlet filter house and ductwork for debris prior

to start-up.  In support of its theory, JH Kelly relies on the definition of "Work" as defined in the

PIEPA:

> all obligations of Supplier under this Agreement, including without limitation the
> design, engineering, procurement, delivery and supply of the Equipment, and
> (subject to Section 3.7.21) the provision of associated ancillary technological
> advisory services in connection with the installation, training, Start-up and testing
> fo the Equipment, all in accordance with the requirements of this Agreement
> including its Exhibits.

Beasly Decl. I Ex. A, at 3, PIEPA Sec. 2 (emphasis added).  Additionally, according to JH Kelly,

Section 3.7.21 requires Mitsubishi to provide technical and advisory support regarding start-up.

That section requires Mitsubishi to:

---

(1985) (although third-party plaintiff had not discharged obligation to plaintiff, the third-party
action was "not premature") (citing Kahn v. Weldin, 60 Or. App. 365, 653 P.2d 1268 (1982)).

> Maintain qualified personnel on the Job Site to consult with Company, the EPC
> Contractor and Company's Consultant regarding the assembly, installation,
> commissioning, Start-up, check out and testing of the Facility through Equipment
> Substantial Completion; provided, that the Parties acknowledge that pursuant to
> Exhibit I, Section C.3, the Contract Price assumes a maximum of sixty-nine (69)
> man-months of time will be dedicated to providing such support and technological
> advisory services, and pursuant to Section 10.5, Supplier will be entitled to a
> Change Order compensating Supplier for any man hours of such support and
> technological advisory services past such assumed sixty-nine (69) man-months
> that are required through Equipment Substantial Completion[.]

Id. at 4, PIEPA Sec. 3.7.21.

Mitsubishi points out that JH Kelly has conceded it had a contract with plaintiff to clean

the equipment; Mitsubishi was not a party to that contract.  Under that contract, JH Kelly could

have liability to plaintiff for the damage caused by the foreign objects, even if the source of those

objects is unknown.  In contrast, nothing in the PIEPA obligated Mitsubishi to inspect or

otherwise take responsibility for or guaranty JH Kelly's work.  Nothing in the "Work" definition

included the obligation of Mitsubishi to inspect the post-delivery work of JH Kelly or anyone

else.  "Work" is limited to the provision of "associate ancillary technological advisory services"

which is subject to Section 3.7.21.  These "ancillary technological advisory services" and the

requirement that Mitsubishi provide qualified personnel on the job site is not the same as a

requirement that Mitsubishi inspect and certify JH Kelly's work.  Mitsubishi underscores that its

technical support was in fulfillment of its own guarantees, not in accordance with JH Kelly's

subcontract.  Indeed, pursuant to Section 24 of the PIEPA, the risk of loss passed to plaintiff once

Mitsubishi delivered the equipment to the site.  Plaintiff has never complained that Mitsubishi

failed to meet its obligations under the PIEPA.  In sum, JH Kelly has failed to identify any

contractual duty Mitsubishi breached for which Mitsubishi could be responsible to plaintiff.

Frankly, it is telling that neither PGE nor plaintiff are pursuing Mitsubishi for the cost of repairing the turbine.

JH Kelly does not argue that the language is ambiguous.  As a result, its references to deposition testimony of plaintiff's employees and JH Kelly's employees as to Mitsubishi's activities on-site are irrelevant.

JH Kelly alternatively argues that Mitsubishi can be liable in tort to plaintiff, even though it has a contractual relationship, because Mitsubishi and plaintiff have a special relationship.  See Georgetown Realty, Inc. v. Home Ins. Co., 313 Or. 97, 110-111 & 110 n.7, 831 P.2d 7, 14 and n.7 (1992) (lawyers, physicians, architects, engineers and liability insurers have special relationships).  I decline to evaluate whether Mitsubishi's relationship with plaintiff can be characterized as "special" under the law.  Even if Mitsubishi could have tort liability to plaintiff, JH Kelly and Mitsubishi do not have a common duty to plaintiff in tort because plaintiff is not alleging a negligence claim against JH Kelly.  JH Kelly's obligation to plaintiff, if any, arises out of contract.  Thus, JH Kelly and Mitsubishi do not have a "common duty" in tort.

In sum, I grant Mitsubishi's motion for summary judgment against JH Kelly's indemnity claim.  Since JH Kelly and Mitsubishi do not share a common contractual duty to plaintiff, JH Kelly's indemnity claim against Mitsubishi must be dismissed.

B.    Contribution

Mitsubishi expressed some confusion about the basis for JH Kelly's contribution claim. It argued that ORS 31.800 permits contribution, but requires that the party from whom contribution is sought be liable in tort.  ORS 31.800(1) ("There is no right of contribution from a person who is not liable in tort to the claimant.").  JH Kelly explained, however, that its claim is

one for equitable contribution.  <u>Certain Underwriters at Lloyd's London v. Mass. Bonding & Ins.</u> <u>Co.</u>, 235 Or. App. 99, 112, 230 P.3d 103 (2010).  Mitsubishi complains that JH Kelly did not plead an equitable contribution claim, but I note that the complaint seeks only "contribution" and does not limit its claim to the statutory remedy.

Mitsubishi next argues that the equitable contribution theory of recovery has been limited to the context of disputes between insurers, beginning with <u>Lamb-Weston, Inc. v. Oregon Auto</u> <u>Ins. Co.</u>, 219 Or. 110, 341 P.2d 110 (1959).  According to Mitsubishi, no Oregon case has extended contribution to non-insurers, and there is no indication the Oregon Supreme Court would do so.

Although not pervasive, Oregon does appear to recognize an equitable contribution theory of recovery.  <u>See</u> <u>Thompson v. Dekum</u>, 32 Or. 506, 52 P. 517 (1898) (sureties, even bound by several separate bonds, could apportion contribution responsibilities); <u>Kahn v. Weldin</u>, 60 Or. App. 365, 653 P.2d 1268 (1982) (applying <u>Lamb-Weston</u> in interpreting statute permitting contribution between judgment debtors); <u>Cranston v. Stanfield</u>, 123 Or. 314, 261 P. 52 (1927) (co-debtors on promissory note).

Nevertheless, like indemnity, a claim for contribution depends on the existence of a shared, common liability.  A claim for common law contribution must be premised on the existence of common liability, such as co-debtorship, common ownership of property, or common contractual obligations.  18 <u>Am. Jur. 2d</u> Contribution § 1 (2004); <u>Cranston</u>, 123 Or. 314; <u>Thompson</u>, 32 Or. at 519 (must be sureties "for a common principal in relation to one and the same obligation").

Page 21 - OPINION AND ORDER

Although a common obligation can arise through separate instruments, <u>Thompson</u>, 32 Or. at 519, for the reasons identified above JH Kelly has failed to demonstrate it shares a liability with Mitsubishi.

## CONCLUSION

For the foregoing reasons, I deny JH Kelly's Motion for Partial Summary Judgment [46] and I grant Mitsubishi's Motion for Summary Judgment [50]. JH Kelly's third-party complaint against Mitsubishi is dismissed with prejudice.

IT IS SO ORDERED.

Dated this _____5th_____ day of May, 2011.


                              ___/s/ Garr M. King_____
                              Garr M. King
                              United States District Judge

Page 22 - OPINION AND ORDER